[Civ. No. 1133.   Fourth Appellate District.—February 21, 1935.]

GEORGE B. SHAFFER, as Executor, etc., et al., Respondents, v. SECURITY TRUST & SAVINGS BANK (a Corporation), Appellant.

Howard F. Shepherd and John F. Bender for Appellant.

John C. Gillham, Lyndol L. Young and Young & Young for Respondents.

MARKS, J.—Plaintiffs secured judgment against defendant in the sum of $3,747.20, being the total sum paid under the terms of an executory contract for the sale of real property between defendant and Maria Meisrimel Lapham, now deceased. This judgment is now before us for review.

The following grounds for a reversal of the judgment are presented: (1) The evidence was insufficient as a matter of law to support the judgment as it does not show that Mrs. Lapham was of unsound mind at the time she executed the contract. (2) A notice of rescission was necessary. The individual plaintiffs gave none. The notice given by the executor was ineffective as it was given without authority either of law or the probate court. (3) The agreement to purchase the real property was part of a concurrent agreement to make a loan and plaintiffs could not rescind the purchase and retain the benefits of the loan. (4) Since no money was paid by Mrs. Lapham, who gave a note secured by a mortgage, a money judgment was improper. (5) Plaintiffs ratified the agreement of purchase. (6) Plaintiffs lost the right of rescission through laches. (7) Money judgment, if any, should have been against defendant as trustee. (8) Judgment does not place the parties *in status quo* because (a) it does not credit the defendant with a loss in the sum of $450 sustained in the sale of the note and mortgage given by Mrs. Lapham, and (b) because it is for money only and does not decree the rescission and cancellation of the contract of purchase and sale.

The questions presented on this appeal require a detailed summary of the evidence.

The contract of purchase bore the date of May 25, 1928. At that time Mrs. Lapham, a widow, was of the age of seventy-three years. The evidence fully justifies the finding of the trial court that she "was mentally weak and mentally infirm, and that, though not insane, was by reason of such old age, weakness of mind and mental infirmities unable, un-

assisted, to properly manage and take care of her property and unable to understand the nature of her acts in signing and executing said agreement of May 25th, 1928.''

Mrs. Lapham was the owner of three lots upon which her home was located, appraised at $7,000 in the probate proceedings, a half interest in a lot in Lennox appraised at $2,500, a ranch in Texas, and personal property of little value. Her sole income was from rents of the Texas property which did not exceed $1500 in any one year.

Mrs. Henrietta McKie was the owner of real estate in or near Culver City in Los Angeles County. A. J. Rigali and S. P. Veselich were real estate operators and subdividers with offices in the city of Los Angeles. They entered into negotiations with Mrs. McKie for the purchase of her property which resulted in the title being placed in defendant. Defendant executed a declaration of trust which provided security for the payment of the unpaid portion of the purchase price to her, the profits to Rigali and Veselich, and permitted the subdivision and sale of the property. The declaration of trust was not recorded.

Rigali and Veselich took possession of the property, subdivided it and entered upon a selling campaign purportedly acting as agents for defendant. They conducted their operations by using lectures, lecture tents, luncheons, salesmen and saleswomen, the usual impedimenta of the promotional subdivider at that time. Mrs. Lapham was taken to the subdivision by a saleswoman and on the first trip agreed to purchase the lot in question for $7,000. Its dimensions were twenty-five feet by one hundred and twenty feet and was in a subdivision of thirty acres that had been used for growing beans. At the time of the trial in January, 1932, the tract had but three houses upon it. The trial judge found that on May 25, 1928, the lot had a reasonable market value of not more than $2,500.

Mrs. Lapham had no money with which to buy the lot. She was told that if she bought it it could be sold in a short time at a substantial profit. Rigali and Veselich entered into a written agreement with Mrs. Lapham whereby she undertook to buy the lot in question for $7,000, they to lend her $4,500 evidenced by a note secured by a mortgage on her Texas property. Thirty-five hundred dollars was to be used as the down payment on the lot and the bal-

ance of $1,000 to be held by Rigali and Veselich subject to the order of Mrs. Lapham. The note and mortgage were executed by Mrs. Lapham with the note drawing interest at seven per cent per annum.

Under the same date defendant and Mrs. Lapham executed a written contract for the sale of the lot to her for $7,000, payable, $3,500 in cash, the receipt whereof was acknowledged, and the balance in installments of $70 per month commencing June 25, 1930. Deferred payments bore interest at seven per cent per annum, from date, payable quarterly. Mrs. Lapham further agreed to pay all taxes and assessments levied against the property. It will thus be seen that in this transaction she assumed annual principal and interest payments of about $1400 when her annual income never exceeded $1500 and often was considerably less than that amount. In addition to these payments it is obvious she would have to provide her living expenses and pay taxes and upkeep on her properties.

During the life of Mrs. Lapham, Rigali and Veselich paid her $150 and also paid some taxes on the lot, and interest on the contract with defendant out of the $1,000 retained by them from the loan on the Texas property.

Mrs. Lapham died on January 11, 1929, and George B. Shaffer was appointed executor of her last will and testament. The parties plaintiff, other than Shaffer, are her heirs at law and the legatees under her will. The executor paid the installment of interest falling due on February 28, 1929, and during the same year paid taxes on the lot amounting to $63.45. An inventory and appraisement of the property of the estate was made in which the ''Agreement with the Security Trust & Savings Bank . . . '' was given a value of $3,500.

On April 11, 1929, the executor through his attorneys asked Rigali and Veselich for an accounting of the $1,000 retained by them on the loan to Mrs. Lapham. On April 27, 1929, they furnished a statement showing $570 in their possession belonging to her. On May 3, 1929, this balance was paid to the executor. On January 17, 1930, Rigali and Veselich wrote the executor that the payments were not being kept up on the contract. On January 20, 1930, the attorneys for the executor wrote Rigali and Veselich that the executor expected to pay the interest in a short time. In

April, 1930, the executor requested Rigali and Veselich to sell the lot and gave them written authority to do so. On June 30, 1930, the executor gave defendant written notice of rescission of the contract, offered to return everything Mrs. Lapham had received and demanded the return of the money paid on the lot. This action to rescind the contract and recover the payments made was filed by the executor on July 18, 1930. An amended complaint was filed on December 16, 1931, in which the heirs at law and legatees of Mrs. Lapham were joined as parties plaintiff. It is admitted that they gave no notice of rescission of the contract.

It should be noted that all of the negotiations for the sale of the lot to Mrs. Lapham were conducted by Rigali and Veselich and their employees. It is not contended that the defendant bank or any of its officers had any actual notice of the fraud or undue influence practiced by the realtors or that they actively participated in any of them. The sole responsibility of the defendant arises through its holding the legal title to the property, its execution of the contract of sale to Mrs. Lapham and its permitting Rigali and Veselich to act as selling agents of the property.

■ Defendant's contention is that the evidence is insufficient to support the judgment as it does not establish that Mrs. Lapham was of unsound mind and lacked legal mental capacity at the time she entered into the contract. In 4 California Jurisprudence, page 782, it is said: "When mental weakness, even though not amounting to absolute disqualification, is associated with inadequacy of consideration, undue influence or a mistaken impression as to the nature and effect of the instrument, the conjunction of any one of these elements is sufficient ground for cancellation." The following cases support this rule: *Moore* v. *Moore*, 56 Cal. 89, *Richards* v. *Donner*, 72 Cal. 207 [13 Pac. 584], *Wilson* v. *Moriarty*, 77 Cal. 596 [20 Pac. 134], *Hays* v. *Gloster*, 88 Cal. 560 [26 Pac. 367], *Longmire* v. *Kruger*, 80 Cal. App. 230 [251 Pac. 692], and *Bryson* v. *Gross*, 83 Cal. App. 638 [257 Pac. 137]. The evidence supports the conclusion that Mrs. Lapham was suffering from weakness of mind arising largely from age and was grossly imposed upon in being induced to purchase for $7,000 a small vacant lot that was never worth more than $2,500 and in the transaction to assume indebtedness that she could never pay. This brings

the case within the rule announced and is sufficient evidence of mental disability, undue influence and lack of adequate consideration to support the judgment.

Defendant next contends that as a condition precedent to the institution of their action it was incumbent on plaintiffs to restore, or to offer to restore, to defendant the thing of value which Mrs. Lapham had received, namely, an equitable interest in and right to purchase the lot in question. It is admitted that plaintiffs, other than the executor, did not offer to restore anything to defendant. It is urged that while the executor did give a purported notice of rescission and offer to restore, it was a useless act as he was serving in a representative capacity with his powers limited by law which gave him no right to dispose of any property of the estate without express authority of law and order of the probate court. He had no authority from the probate court to serve the notice of rescission or offer to restore to defendant any interest in the lot in question.

It is too well settled in California to permit of question that as a general rule a notice of rescission and an offer to restore must be given or a restoration of the property must be made before an action for rescission can be maintained. It is as equally well settled that there are equally well-settled exceptions to this general rule. Some of them are set forth in *Kelley* v. *Owens,* 120 Cal. 502 [47 Pac. 369, 52 Pac. 797], where the Supreme Court said: ''There are exceptional cases where restoration or an offer to restore before suit brought is not necessary—as, for instance, where the thing received by the plaintiff is of no value whatever to either of the parties; or where the plaintiff has merely received the individual promissory note of the defendant; or where the contract is absolutely void; or where it clearly appears that the defendant could not possibly have been injuriously affected by a failure to restore; or where, without any fault of plaintiff, there have been peculiar complications which make it impossible for plaintiff to offer full restoration, although the circumstances are such that a court of chancery may by a final decree fully adjust the equities between the parties.'' (See, also, *California etc. Co.* v. *Schiappa-Pietra,* 151 Cal. 732 [91 Pac. 593] ; *Matteson* v. *Wagoner,* 147 Cal. 739 [82 Pac. 436] ; *Rosemead Co.* v. *Shipley Co.,* 207 Cal. 414 [278 Pac. 1038] ; 4 Cal. Jur. 767, sec. 9, and cases cited.)

The case of *Norton* v. *Rosenkranz*, 62 Cal. App. 226 [216 Pac. 380], is factually similar to the instant case on the question we are considering. There the plaintiff was purchasing under an executory contract of sale and purchase two lots and a house to be erected upon them. The house was not constructed according to specifications and she brought her suit to rescind the contract and recover the money paid by her without restoring or offering to restore what she had received. The defendant made the identical contention that is made here. In concluding that restoration or an offer to restore was not a condition precedent to maintaining the action the court said:

"It is next claimed that the evidence fails to show that the plaintiff ever accomplished a rescission of the contract, for the reason that she never restored or offered to restore the things of value she had received under the contract as required by section 1691 of the Civil Code.

"The rule announced by this section is based upon the principle that he who seeks equity must do equity. In this connection it is well settled that any person demanding a rescission of a contract to which he is a party must restore or offer to restore to the other whatever he may have received under the contract in the way of money, property or other consideration of benefit. It is only by doing this that he can entitle himself to the return of what he, on his part, may have given or paid, and to be released from the contract. Such in effect are the requirements of the section above referred to. Restoration to the *status quo ante*, however, is not essential in all instances. There are situations where the party who seeks to rescind has received nothing of value, and under such circumstances, as there is nothing to restore, the rule does not apply (*Larkin* v. *Mullen*, 128 Cal. 449 [60 Pac. 1091]; *Spreckels* v. *Gorrill*, 152 Cal. 383 [92 Pac. 1011]). In the instant case one of the things that it is claimed plaintiff received under the contract was the muniment of title evidenced by the executory contract here sought to be rescinded. It is admitted that plaintiff failed to tender a return of this instrument. In her complaint she sets forth that she received nothing, and the court so found.

"This contention presents the question whether or not, under the circumstances of the case, plaintiff was bound

to surrender or offer to surrender her executory contract of sale to defendant before being entitled to rescind. In support of this claim it is in substance argued that plaintiff by virtue of her contract received an equitable title in and a lien upon the property, and the only means by which she could restore the defendant to his original status was by giving or tendering him a return of this instrument or a quitclaim deed relinquishing her interest, and that such tender was a condition precedent to her right of recovery.

''We see no merit in this contention. One seeking the rescission of a contract is not required to make a tender or offer of restoration of that which he would be entitled in any event to retain. Here plaintiff had conveyed to defendant her interest in the lots acquired by her under her original contract with defendant, and she was entitled to retain her contract evidencing this interest for her own protection in the event that rescission should be denied her (2 Black on Rescission and Cancellation, sec. 621). It is not claimed that any sale was effected under the executory agreement, as the contract provided that a conveyance was to be made only upon full performance; but even conceding, for the purpose of the case, that the outstanding unrecorded executory agreement constituted a cloud upon the title to the property, and was therefore a thing of value within the meaning of the code section, it was an interest which plaintiff had acquired, and one she was entitled to retain by reason of her payments, and until a determination of her rights was had she was not bound to relinquish this evidence of interest.

''In conformity with this view it has been held that where a plaintiff was seized in fee of two pieces of land, and was induced by fraudulent representations as to his title to relinquish one piece in consideration of a deed to the other, in order to maintain an action to set aside his conveyance of the one piece upon discovery of the fraud, it was not necessary to restore the other so as to put the parties *in statu quo*. (*Du Pont* v. *Du Bos,* 52 S. C. 244 [29 S. E. 665].) See, also, *Matteson* v. *Wagoner,* 147 Cal. 739 [82 Pac. 436]; *Wills* v. *Porter,* 132 Cal. 516 [64 Pac. 896]; 2 Black on Rescission, p. 1432.

''The court had under the pleadings power to do exact justice between the parties and place them both *in statu quo*

by adjudging their rights in and to the property, and its judgment determines such rights, and is *res adjudicata* upon the subject. This is all that plaintiff sought by her action. (*Wills* v. *Porter, supra; Schneider* v. *Schneider,* 125 Iowa, 1 [98 N. W. 159].)'' (See, also, *Zeller* v. *Milligan,* 71 Cal. App. 617 [236 Pac. 349]; *Rosemead Co.* v. *Shipley Co., supra.*)

The foregoing decisions furnish us ample authority for concluding that under the facts 'of the instant case a notice of rescission and offer to restore or restoration was not a necessary prerequisite to maintaining this action. This conclusion makes it unnecessary for us to decide the legal effect of the notice of rescission and offer to restore given by the executor.

We cannot agree with the contention of defendant that the contracts of Mrs. Lapham with Rigali and Veselich for the loan and defendant for the purchase were part and parcel of the same transaction, must be considered together, and that the one cannot be rescinded without rescinding the other. The agreement between Rigali and Veselich and Mrs. Lapham for the loan was between them and defendant had nothing to do with it. It provided for a loan by Rigali and Veselich to Mrs. Lapham of $4,500 with her Texas property as security. It was understood that she was to purchase the lot here in question, but, we take it, this reference to the purchase of the lot was necessarily made to explain the understanding concerning the disposition of the $4,500, $3,500 of which was to be paid by Rigali and Veselich to the owner of the lot (defendant) and the balance of $1,000 to be held by them subject to the order of Mrs. Lapham. The contract of purchase executed by Mrs. Lapham and defendant was complete in itself and made no reference to the loan agreement or to Rigali and Veselich. In so many words, it receipted to Mrs. Lapham for the down payment of $3,500. The source from which she obtained this money was entirely immaterial as far as her contract with defendant is concerned. The fact that a large part of this down payment was returned to Rigali and Veselich by defendant (probably almost $2,800) was also immaterial as far as Mrs. Lapham and her contract of purchase is concerned. This was done under the terms of the declaration of trust which was unrecorded and of which Mrs. Lapham had no

notice. The contract between Mrs. Lapham and defendant had no reference to the loan agreement or to Rigali and Veselich and, to maintain the action against defendant, it was not necessary to join the realtors as defendants or to restore to them anything Mrs. Lapham had received from them under her separate agreement with them. (*Gilson Quartz Min. Co.* v. *Gilson,* 47 Cal. 597.)

■ The foregoing also disposes of the contention that a money judgment against defendant was improper because Mrs. Lapham did not pay it any money. Of course, she did not physically hand this money to defendant. She created a fund in the hands of Rigali and Veselich out of which the payment was to be made. They agreed to make the payment out of this fund and defendant receipted to Mrs. Lapham for the money. The payment was made by her just as surely as though Rigali and Veselich had handed her the $3,500 upon completion of the mortgage transaction and she had handed defendant the same money.

■ Defendant seriously contends that plaintiffs ratified the transaction after the death of Mrs. Lapham by the course of conduct we have already outlined. It is urged that they had notice of her mental infirmities during the time they were treating the contract as a valid and binding obligation. This may be true, but there is ample evidence in the record supporting the finding of the trial court that during this time none of them had any knowledge that on May 25, 1928, the lot had a reasonable market value of only $2,500 instead of $7,000. Notice to them of the fraud and undue influence was not complete until they knew that Mrs. Lapham had been defrauded, in other words, until they learned of the actual value of the lot. They did not learn of this value until a short time before this action was instituted.

■ We cannot conclude that plaintiffs were guilty of any laches in view of the evidence and of the contrary finding of the trial court. The devisees and heirs at law of Mrs. Lapham lived in Europe. As soon as the executor learned all the circumstances of the sale and the value of the property he communicated these facts to the heirs and asked for instructions. Shortly after these were received he gave notice of rescission and instituted this action. The finding

against the defense of laches is amply supported by the evidence.

The argument that the judgment could only be rendered against defendant as trustee and not in its individual capacity has been resolved against defendant by the case of *Wedge* v. *Security-First National Bank of Los Angeles*, 219 Cal. 113 [25 Pac. (2d) 411]. This for the reason that defendant executed the contract in its individual capacity and not as trustee, that the declaration of trust was not recorded and that Mrs. Lapham had no notice or knowledge of it.

The contention that the judgment should be reduced by $450 cannot be sustained. Rigali and Veselich sold the note and mortgage of Mrs. Lapham at a discount of that amount. The loss was theirs and not that of defendant.

The argument that a rescission cannot be had because the lot had depreciated in value between forty and fifty per cent during the years of depression cannot avail defendant. The rescission goes back to the date the contract was executed. The fraud was committed and the undue influence exerted upon her at that time. That the market value of all real estate, including the lot in question, depreciated sharply was no fault of Mrs. Lapham or the plaintiffs. It might be remarked that the money which defendant must pay plaintiffs has also depreciated in value about forty per cent since the date when the payments were made to it.

We have concluded that the final contention of defendant that the judgment should have provided for the cancellation and surrender of the contract of purchase must be sustained. Such a contract gives the purchaser an equitable interest in property. In order to put the parties in the position they occupied before it was executed the judgment should have provided that the contract be cancelled and surrendered to defendant in addition to directing that the money paid be refunded by defendant.

It is ordered that the judgment be modified by the trial court by adding to it a provision that the contract dated May 25, 1928, between Security Trust & Savings Bank, a corporation, party of the first part and seller, and Maria M. Lapham, a widow, party of the second part and buyer, whereby the seller agreed to sell and the buyer agreed to buy lot six of tract number 9648, as per map recorded in

book 142, pages 13 to 15, both inclusive, of maps, in the office of the county recorder of Los Angeles County, be cancelled and declared null and void and be surrendered by plaintiffs to defendant, and as so modified the judgment is affirmed. The parties will pay their own costs of appeal.

Barnard, P. J., and Jennings, J., concurred.