[Civ. No. 3631.  Fourth Dist.  May 26, 1947.]

ANNIE W. WEBB, Respondent, v. C. B. SAUNDERS et al.,
Appellants.

Stickney & Stickney, Edward Strop and William A. Wylie for Appellants.

Sol Price and Frank Nottbusch, Jr., for Respondent.

GRIFFIN, J.—Action to rescind a deed. Plaintiff and respondent Annie W. Webb, a widow, approximately 85 years of age in 1943, lived next door to defendants and appellants C. B. and Myrtle Saunders, husband and wife. Mrs. Webb's closest relatives were second cousins living in Canada.

According to the depositions of defendants, they performed neighborly acts for plaintiff for quite some time and gained her confidence to the extent that she entrusted Mr. Saunders with approximately $2,500 of her money, which he kept in his personal bank account. He borrowed $2,000 from her to make

a down payment on a house he purchased next door to plaintiff's home so they, at plaintiff's request, could be close to her.

In December, 1943, Mrs. Webb was obliged to go to her doctor and to the county hospital for treatment for a gangrenous infection of the left little toe, which toe was later removed. Mr. Saunders drove her in his machine to these several places. He also painted her house for her and she paid him $200 for this service. They were subsequently informed by the doctor that Mrs. Webb's left leg must be amputated. This surgery was done on December 30, 1943. On December 27, 1943, Mrs. Webb, while in the hospital, executed a purported grant deed of her home to defendants, reserving a life estate therein. It was recorded the same day. The recitation was for "a valuable consideration" and no internal revenue stamps were attached.

Mr. Saunders testified that Mrs. Webb wanted to give them the place "because we had been so nice to her . . . wanted us to have the place *if anything happened to her there in the hospital if she passed on*" (italics ours); that one time when Mr. Saunders took her to see her doctor Mrs. Webb stated to him that she intended to leave her property to some friend and that he then told her that if she was going to leave the property to someone why didn't she deed it to whoever she wanted to have the property, reserving a life estate; that he, defendant Mr. Saunders, secured the services of a Mr. Ryan to draw up the deed and he, defendant, presented it to her on December 27, 1943; that Mrs. Webb had been in the hospital about three weeks prior thereto and defendants had been visiting her every night; that a Mr. Johnson, manager of the hospital, notarized the deed and he asked Mrs. Webb if she knew what she was signing and if she wanted to give the defendants the house and that she answered in the affirmative. However, Johnson testified that although she asked to have the deed acknowledged, and that she knew what she was doing, on cross-examination he testified that he was of the opinion that "anyone who is sick, such as she was, they are not mentally able to know exactly what they are doing."

Mr. Saunders then testified that he knew that there was a probability of Mrs. Webb not being able to recover from the amputation of her left leg; that she directed him to contact an attorney to prepare a will, subsequent to the execution

of the deed, which he did do and a will was executed in the presence of the attorney and her doctor; that on January 15, 1944, he paid her bills at the hospital at her request, with her money, and took her to her home; that for about two months thereafter his wife cared for her and received $100 for her services; that he built a fence around her house and was paid by Mrs. Webb approximately $300 for services and material furnished; that one day he was taking her to see the doctor and Mrs. Webb remarked that she was under the impression that she had given defendants her property in a will and also that she found out she had given them a deed to her place and that she wanted it back; that he told her he didn't want anything that belonged to her and that she could do as she wished about it; that after that Mrs. Webb got mad and they were not on too friendly terms; that at no time did he promise to take care of her the rest of her life, and that he later made an accounting for her about the money matters and returned $1,900 to her by check.

Mrs. Saunder's deposition shows that she found out, from her husband, about the deed, on December 27, 1943; that she told Mrs. Webb, on the day her leg was amputated, that she would take care of her but did not say for how long; that she took care of her for two months and Mrs. Webb informed her that thereafter she had someone else to care for her.

Mrs. Webb testified that during the first month she was at the hospital she remembered "very, very little" of what transpired; that her mind was "kind of in a daze"; that she did not know what was going on around her; that the first time she knew about the signing of the deed was in 1945, after she had placed her home on the market for sale, and it was about this time, when Mr. Saunders was taking her to an oculist, that he told her: "Now you know that you have signed away your property."

The court rejected respondent's offer to show that on February 7, 1945, she listed the property for sale with a real estate agent, as free and clear. It was in connection with this attempted sale that she said she first found out she had deeded her property to defendants.

The hospital record of Mrs. Webb was received in evidence. Her doctor testified that the physical condition of Mrs. Webb on December 27, 1943, was poor and she was in a condition of *extremis;* that she was given a general anaesthetic on December 23, 1943, when he removed her toe and also some narcotic;

that in addition, she was suffering from other ailments such as arteriosclerotic condition of the nerve centers, and, having had to be given so many narcotics, there were times when she was dazed; that he observed her mental condition and there were times when she appeared dazed, but that he would not say that she was of unsound mind; that persons in such condition are at times rather vague, not precise, and have lucid intervals, and then are befogged at times; that her mental processes were disjunctive; that Mrs. Webb had mentioned on more than one occasion that she did not remember having signed the deed; that a variation of over 12 years as to her age, which variation was given by her at different times, indicated to him a deterioration of her mental condition to a certain degree. However, the doctor did testify that he believed her competent to execute a will and to transact any business that she so desired.

This action was filed in June, 1945, alleging plaintiff was infirm, physically and mentally; that she was approximately 75 years of age and had been suffering from a diseased condition of one leg, necessitating its removal; that on December 26, 1943, and for several days prior thereto there had been administered to her large quantities of opiates; that by reason of such physical and mental condition, on December 27, 1943, she was incapacitated from doing any business or entering into any contract whatsoever; that knowing these facts, defendants caused plaintiff to execute the deed; that defendants falsely represented said deed was a will; that plaintiff believed the representations to be true and signed the deed. The second cause of action contained a similar allegation and alleged that at the time of executing the deed plaintiff did not intend to convey to defendants any title to the property.

After trial, the court found that plaintiff was in fact about 85 years of age; that, as to the deed, she had no independent legal advice; that she had been suffering for some months prior to and on December 27, 1943, with a diseased condition of one leg; that gangrene had infected it; that she was in a weakened physical condition; that the probability of her living was extremely doubtful and it was known to her; that her mind, while clear, was yet in such a weakened condition that, though not incapable of understanding the details of a business transaction, she was incapable of exercising sound business judgment and was prone to do improvident things, and that while she was in such mental condition she executed to de-

fendants the deed involved and that it was an improvident conveyance. It then found as untrue that she was, at the time, under the influence of any opiates or sedatives; that it was *untrue* that defendants, *knowing of plaintiff's incapacity and infirmity,* and for *the purpose of defrauding her,* procured *plaintiff to execute the deed;* that plaintiff herself suggested the execution of the deed; that Mr. Saunders became active in causing it to be drawn up and executed and that he knew **exactly what the mental** condition of plaintiff was at the time; **that it was** untrue that defendants falsely claimed to plaintiff that the instrument was a will or that plaintiff believed it was; that it is true that no consideration was given for the deed. As to the second cause of action it was found that plaintiff *did intend to convey to defendants some title to the property.*

In the court's oral decision, a copy of which is in the record, the force of its findings is explained. It points out that the allegations in the pleadings are in many respects different from the findings and the evidence supporting them; "that undue influence may be of more sorts than one"; that since there was no allegation of confidential relationship, plaintiff's offer to amend the pleadings charging such to conform to the proof was untimely, as it came after the parties had rested their case, and further, that there was no equitable basis for such a motion, since the court had admitted evidence bearing upon that question *upon another theory.* The motion to amend the pleadings could have been granted. It was a discretionary matter.

The trial judge then stated that in his opinion plaintiff's general physical condition was approximately as set out in the complaint, but that the effect of the opiates "must have worn off before the time the deed was executed"; that he believed she was in a "very weakened condition, physically" and that "her mind . . . was, in the circumstances, a weak mind"; that there was no fraud "except as it may be said to result from the fact that there was no consideration for the conveyance." Speaking of these findings, he then comments "it might be thought that they would require a judgment for defendants, but there are certain authorities that give me pause in any conclusion that that is the result," citing *Shaffer* v. *Security Trust & Savings Bank,* 4 Cal.App. 2d 707, 712 [41 P.2d 948]; 4 Cal.Jur. p. 782, § 18; *Moore* v. *Moore,* 56 Cal. 89, 94; *Richards* v. *Donner,* 72 Cal. 207 [13 P. 584]; and *Allore* v. *Jewell,* 94 U.S. 506 [24 L.Ed. 260].

After citing these authorities, he then concludes that the concurrence of the two elements, weakness of mind and inadequacy of consideration, were sufficient grounds for cancelling the deed; that undue influence may be presumed from the two elements. Other elements tending to support the conclusion were that she had no independent legal advice in reference to the deed; that the conveyance was not a provident exercise of judgment; and that there was no agreement to care for her as a part of any consideration. He concluded that there were sufficient facts pleaded and found to be true which would, in effect, amount, in substance, to a pleading and finding of undue influence.

The evidence seems clear that Mr. Saunders was entrusted with several hundreds of dollars of plaintiff's money for several indicated purposes. He placed the money in his own bank account and in his own name. He drew checks on it in payment of plaintiff's bills. He used it in financing his own home. He was trustee of that fund during all of the transactions in reference to the deeding of the property to him and his wife as joint tenants. The evidence further indicates that as a part of the inducement to transfer the real property defendants stated they would care for plaintiff if she survived the operation. Mr. Saunders' deposition also shows that it was Mrs. Webb's desire that they have her home only if anything happened to her there in the hospital, i. e., if she passed on, and that he remarked that "if that was the way she wanted it why that would be all right with me, I suppose." He further testified that she told him that she was "worried" about going to the county hospital and that the "County would take her place, her home, which, as a matter of fact . . . was one reason she gave me all this money to take . . . care of her, so she could say she didn't have any money in the bank. . . ."

At the outset, we are convinced that the evidence produced fairly indicates that the ultimate conclusion reached by the trial court, i. e., that the deed should be canceled and set aside, should be sustained. It further indicates that an intimate and confidential relationship between the parties existed and that defendants should be bound by the rules prescribed on that subject. ▊ Gifts or benefits from a principal to one occupying a fiduciary or confidential relation to him, while not absolutely void, are presumptively void, and persons standing in such a relation to others cannot entitle themselves to hold

benefits which those others have conferred upon them, unless they can show to the satisfaction of the court that the person by whom the benefits have been conferred had independent advice in conferring them and that the dealings were fair. Such transactions will be set aside upon the discovery of the least fraud and the burden is upon the party benefited to show that the confidence was not abused, by proving that the other party acted, not upon any reliance or confidence placed in the former, but with full knowledge of the facts, and entire understanding of the effect of the transaction. (4 Cal.Jur. p. 778, § 16.) ▮ It is also a general rule that equity regards and treats the relation of principal and agent in the same general manner and with nearly the same strictness as that of trustee and beneficiary. (Civ. Code, § 2322; 1 Cal.Jur. p. 788, § 77.) ▮ ▮ The law requires perfect good faith on the part of agents, not only in form, but in substance, and not only from agents receiving compensation, but also from gratuitous agents (1 Cal.Jur. p. 790, § 78), in which case the burden is upon the grantee to show that the deed was made freely and voluntarily, and with full knowledge of all the facts and with perfect understanding of the effect of the transfer. (*Campbell* v. *Genshlea,* 180 Cal. 213 [180 P. 336]; *Calmon* v. *Sarraille,* 142 Cal. 638 [76 P. 486].)

The trial court has not directly found on this question. Plaintiff's pleadings do not allege such a relationship. A proper finding based on these facts, under proper allegations, might legitimately support the judgment. An analysis of the findings indicate that a finding touching on this subject was intended, but the actual findings as signed are not consistent with this theory of the case.

Summarizing the findings, they merely find that plaintiff was "in a very weakened physical condition"; that her mind, though clear, was in such a weakened condition that though capable of understanding the details of any business transaction, she was incapable of exercising sound business judgment and was prone to do improvident things; that while in such mental condition she executed the deed; and that there was no consideration for its execution. As opposed to those findings, the court specifically found no fraud or false representations of defendants in procuring its execution, except such as may be inferred from the facts found true, and that the execution of the deed was done at plaintiff's suggestion. Then a direct finding is made that at that time *"plaintiff did*

*intend to convey to defendants . . . some* title or estate . . . to the property," and that defendants did not "procure plaintiff to execute the deed." ■ In the absence of a finding of some confidential relationship or undue influence, the mere fact that one is "prone to do improvident things" as that term is defined, and "incapable of exercising sound business judgment," standing alone, would not ordinarily give rise to a cause of action for cancelling a deed. If this were true, many of us could set aside transactions or investments we have made which later happenings proved us to be improvident and to show lack of capability of exercising sound judgment. Some additional facts are required to satisfy the rule. The additional facts relied upon show but a weakened *physical condition* and a clear but *weakened mind.* It was weakened only to the extent that she was incapable of exercising sound business judgment and was prone to do improvident things. ■ There might have been some plausible argument to support the judgment on the facts found (giving them their most liberal construction) if it had not been for the specific finding that she "intended to convey . . . to defendants some title or interest . . . to the property," and that defendants did not "procure plaintiff to execute the deed," which to us seems to negative any implied finding of undue influence.

Undue influence has been defined to be that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment, and whereby the will of the person is overborne and he is induced to do or forbear to do an act which he would not do, or would do, if left to act freely. (*Estate of Olson,* 19 Cal.App. 379 [126 P. 171]; Civ. Code, § 1575; 6 Cal.Jur. p. 70, § 40.)

Here, it is specifically found that notwithstanding any such limited weakened mind condition, plaintiff "did intend to . . . convey to . . . defendants . . . some . . . title or estate . . . in . . . the . . . property," and further found that it was not true that "plaintiff by reason of her physical and mental infirmity . . . mistakenly assumed that said instrument was a will and did not dispose, transfer or alienate any interest in said real property until her death." If she intended to transfer the property as a gift, no consideration was necessary.

In *Shaffer* v. *Security Trust & Savings Bank, supra,* relied upon by respondent, the trial court found, upon competent

evidence, that the grantor was mentally weak and mentally infirm and that, though not insane, was by reason of such old age, weakness of mind and mental infirmities, unable, unassisted, to properly manage and take care of her property and *unable to understand the nature of her acts in signing the agreement.* "Mere mental weakness, whether natural or produced by old age, sickness or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not sufficient ground to defeat the enforcement of an executory contract or to set aside an executed agreement or conveyance. . . . To establish mental incapacity sufficient to justify cancellation on that ground alone, it is essential to prove, not necessarily total lack of understanding, but that the person was unable to exercise a rational care of his property by reason of mental delusion." (4 Cal.Jur. p. 782, § 18.)

The court did uphold a judgment setting aside a deed in *Estate of Brast,* 69 Cal.App.2d 704 [160 P.2d 193], for "great mental weakness" of mind under facts much stronger than here presented, but it was also found in that case that there was a confidential relationship existing between the parties and that the deed was produced by the suggestion and activity of the appellant.

In *Moore* v. *Moore, supra,* also cited by respondent, the allegations were that plaintiff did not know the contents of the deeds signed, their purpose or effect; that she was induced to execute them by undue influence and without consideration while she was in a mental state of shock, and there existed a great weakness of mind, and a "great mental and physical prostration." From the facts pleaded, it was concluded that it might be inferred that defendants not only took, but that they designed to take, an unfair advantage of her weakness of mind. We have no such finding in the instant case.

In *Richards* v. *Donner, supra,* there was a finding of "great mental weakness" on the part of plaintiff while executing a gift deed to defendant, "without understanding the nature, effect or consequences of his act," and it was further found that imposition was produced by defendant through which plaintiff was induced to execute the deed. It was there held that from such facts found, a conclusion of law of undue influence must be drawn. No such conclusion can be drawn from the facts here found, particularly since

the court specifically found that plaintiff actually "intended" to transfer some interest in the property to defendants. *Allore* v. *Jewell, supra,* is also cited in that case.

■ A person of weak mind may rightfully dispose of her property according to her own will. ■ The finding that plaintiff "intended" this very thing, even without legal advice, voluntarily and without any domination, fraud or undue influence on the part of defendants, and that no advantage of the grantor was taken by them, tends to negative such findings, when liberally construed, as would tend to support the judgment. Under these inconsistent findings, therefore, the judgment should be reversed with directions to permit plaintiff to amend her complaint by alleging the confidential relationship, if she be so advised.

Judgment reversed with such directions.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied June 17, 1947, and appellants' petition for a hearing by the Supreme Court was denied July 22, 1947.